Filed 4/15/14  P. v. Davis CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

|  |  |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>ANTHONY J. DAVIS,<br><br>     Defendant and Appellant. | A137351<br><br>(San Mateo County<br>Super. Ct. No. SC075298) |

Anthony J. Davis appeals from a judgment of conviction and sentence imposed after he was convicted of corporal injury on a cohabitant and assault with intent to cause great bodily injury.  (Pen. Code, §§ 273.5, subd. (a), 245, subd. (a)(4).)[1]  He contends the court erred in denying his motion for appointment of a new attorney, because his existing attorney was ineffective for failing to seek discovery of the personnel files of the arresting and investigating police officer.  We will affirm the judgment.

I.  FACTS AND PROCEDURAL HISTORY

An information charged Davis with corporal injury on a cohabitant (§ 273.5, subd. (a)) and assault with intent to cause great bodily injury (§ 245, subd. (a)(4)).  It was also alleged that Davis had two prior strike offenses and served four prior prison terms.  (§§ 1170.12, subd. (c)(2), 667.5, subd. (b).)

---

[1]     Except where otherwise indicated, all statutory references are to the Penal Code.

1

Davis filed several motions to have his attorney discharged and new counsel appointed.  (*People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*).)  The first motion—at issue here—was heard and denied on April 30, 2012, before trial.  Others were denied on May 9, 2012, June 26, 2012, and November 1, 2012.

A.  Evidence at Trial

About 2:00 a.m. on February 12, 2012, San Bruno police officers Kevin McMullan and Palatavake Helu were dispatched to victim Jozzette Bullock's apartment in San Bruno.

1.  Victim Bullock's Statement to Officer Helu

Officer Helu testified that Bullock "was visibly upset [and] crying and looked to be fearful."  She said that appellant, her live-in boyfriend of two years, struck her, pushed her down, struck her in the face, and strangled her in one of the bedrooms of her apartment.  Helu observed bruising on Bullock's left cheek and the left and right sides of her lower neck.

2.  Witness Aruwah's Statement to Officer McMullan

Officer McMullan testified about his interview at the scene with appellant's mother, Laurie Aruwah.  Aruwah stated that she heard "sounds of a scuffle" in the bedroom and that appellant and Bullock were involved in a fight inside the bedroom.  Aruwah's granddaughter, Tonisha Davis (Tonisha), ran to the bedroom to find out what happened.[2]  Aruwah heard Tonisha scream, saw appellant leave the bedroom, and told appellant it was not right to hit a woman.  Aruwah explained to McMullan that she knew appellant had hit Bullock, because Bullock ran out of the bedroom screaming that she had been hit and "she was all red in the face."

3.  Witness Tonisha's Statement to Officer McMullan

Officer McMullan also testified about Tonisha's statement at the scene.  Tonisha reported that she had heard yelling coming from the bedroom and things "banging around" inside the bedroom.  When she opened the bedroom door, she saw

---

[2]     Because Tonisha Davis has the same last name as appellant, we refer to her by her first name for clarity, without disrespect.

2

Bullock crouching on the floor in the corner of the room, and appellant was strangling her with his right hand around her throat. It looked like Bullock was having difficulty breathing. Tonisha screamed at appellant to let go of Bullock. When he did, Bullock began kicking at appellant's legs, and appellant resumed strangling her with his right hand. Tonisha screamed again, and appellant let go and walked past her into the living room, where he was confronted by Aruwah.

### 4. Victim Bullock's Statement to Officer Helu at the Police Station

Over an hour after talking with Bullock at her apartment, Officer Helu interviewed her at the police station. An audio recording of the interview was played for the jury.

During the interview, Bullock told Officer Helu that appellant did not live with her. She claimed that she and appellant started arguing at a laundromat and continued the argument in her apartment. Inside the bedroom, he grabbed her by her shirt and threw her to the floor, causing her earrings to fall off.[3] He called her a "stupid bitch." She kicked at him, and he hit her on her left cheek with a closed fist and grabbed her by the neck. While Bullock was trying to kick him, Tonisha entered and screamed, "Stop, stop, get off of her." Bullock called 911.

### 5. Witness Aruwah's Trial Testimony

Aruwah, appellant's mother, gave a decidedly different account at trial. She testified that she saw appellant and Bullock in the bedroom "hooping and hollering at each other," and then *Bullock attacked appellant* and slapped him across his face. Appellant grabbed Bullock "and pushed her and she fell back in between the bed and the dresser." When appellant tried to pick Bullock up, Aruwah's boyfriend (Art) pushed appellant away and tried to assist Bullock. Aruwah told appellant "to get the hell out [of] the room." When Aruwah told appellant not to put his hand "on any woman," appellant told her he had not put his "hand on her; I just push her." Although Bullock told appellant she was tired of him hitting on her, Aruwah never saw her son "hitting on

---

[3]     On direct examination, Officer Helu confirmed that he found Bullock's earrings "in the area where she said she fell."

3

[Bullock], only [Bullock] hitting on him." She claimed Bullock became bruised when Bullock fell and hit the dresser, and she never heard Tonisha yell at appellant to "get off of" Bullock. Aruwah further claimed she told an officer that she had seen Bullock approach appellant as if to attack him, and that appellant had grabbed Bullock and pushed her away.

### 6. Witness Tonisha's Trial Testimony

Tonisha also offered a different account at trial. She testified that she saw Bullock and appellant go into a bedroom and heard a slap. She then saw Bullock hit appellant "[l]ike three, four, five" times; appellant pushed her onto the bed, she grabbed his shirt while she hit him, he pushed her away, and she fell off the bed and "hit her head between the computer desk and the bed and then she let him go." Tonisha claimed she never saw appellant with his hand around Bullock's neck, she never told the officer that she saw Bullock attack appellant or be physical with him, and she did not tell the officer that appellant had his hand around Bullock's neck—only that "it looked like it." Tonisha further denied telling the officer that Bullock appeared to have problems breathing or that appellant let go of her neck and "go back a second time." She acknowledged saying that she yelled at appellant "to stop and get off of" Bullock.

### 7. Victim Bullock's Testimony

At trial, Bullock invoked her Fifth Amendment right not to testify, and the court granted the prosecution's motion to read the transcript of her preliminary hearing testimony to the jury.

According to Bullock's preliminary hearing testimony, appellant grabbed her arm to calm her down because she was "freaking out." She was "really drunk" and "just kind of remember[ed] certain parts."[4] She recalled pushing appellant because she was mad at him. She also remembered yelling at him in the bedroom, standing by the

---

[4]     Officer Helu did not smell alcohol on her person or notice her stagger or have difficulty maintaining her balance during the time he spoke with her. The jury had the opportunity to assess her speech from the audio recording of her interview at the police station.

4

side of the bed, stepping backwards and tripping over the bed, and ending up on the floor. She denied telling Officer Helu that appellant had choked or punched her, and she denied that appellant had ever done so.

B. Jury Verdict and Sentence

The jury found appellant guilty on both counts. In a bifurcated proceeding, the court found true the allegations of prior strike offenses and prior prison terms. The court later granted appellant's motion to strike his prior serious felonies for purposes of section 1170.12, subdivision (c)(2).

The court sentenced appellant to state prison for a total term of four years, consisting of the three-year middle term for corporal injury on a cohabitant (§ 273.5, subd. (a)) plus a consecutive one-year term for a prior felony conviction (§ 667.5, subd. (b)). The court stayed the sentence on the assault count pursuant to section 654 and imposed concurrent terms for three additional priors.

This appeal followed.

II. DISCUSSION

Appellant contends the court erred in denying his motion to discharge his counsel on the eve of trial and have new counsel appointed under *Marsden*. He argues the court should have granted his motion because his attorney was ineffective for "failing to request records of prior complaints against the police officers in this case" pursuant to Evidence Code section 1043 and *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*). The failure to file such a motion "may have deprived appellant of critical evidence that went to the heart of his defense," he claims, and it may have "resulted in the withdrawal of a potentially meritorious defense" that "the police report was factually inaccurate due to errors or omissions, motivated by the officer's personal animus against appellant." Appellant urges that the credibility of the officers' accounts of the victim's and witnesses' statements at the scene was vitally important, particularly in light of the witnesses' contrary testimony at trial (see *ante*).

A. <u>Law</u>

When a defendant seeks substitution of appointed counsel on the ground of ineffective representation, the defendant must show that appointed counsel is providing inadequate representation or that counsel and the defendant " 'have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result.' " (*People v. Fierro* (1991) 1 Cal.4th 173, 204 [" 'A defendant is entitled to relief if the record clearly shows that the first appointed attorney is not providing adequate representation' "].) We review the court's denial of a *Marsden* motion for an abuse of discretion. (*People v. Earp* (1999) 20 Cal.4th 826, 876.)

As mentioned, appellant contends his attorney failed to provide adequate representation by failing to file a motion under *Pitchess* and Evidence Code section 1043 to discover documents from Officer Helu's personnel file. To obtain such documents, a defendant must show good cause. (*California Highway Patrol v. Superior Court* (2000) 84 Cal.App.4th 1010, 1019-1020 (*California Highway Patrol*).) A showing of good cause requires the defendant to demonstrate the materiality of the requested documents and to state upon a reasonable belief that the agency has them. (Evid. Code, § 1043, subd. (b)(3); *City of Santa Cruz v. Municipal Court* (1989) 49 Cal.3d 74, 83.) As to materiality, the defendant must present "a 'specific factual scenario' which establishes a 'plausible factual foundation' for the allegations of officer misconduct committed in connection with defendant." (*California Highway Patrol, supra*, 84 Cal.App.4th at p. 1020.)

Depending on the circumstances of the case, the specific factual scenario required for a showing of materiality may be based on the defendant's denial of specific facts asserted by the officer in a police report. (*Warrick v. Superior Court* (2005) 35 Cal.4th 1011, 1024-1025.) In that context, the court examines the defense averments in light of the police report and any other submitted evidence to determine if there is a plausible scenario of police misconduct. (*Id*. at p. 1025; see also Evid. Code, § 1045.)

6

B.  Appellant's Showing

At his April 30, 2012 *Marsden* motion, appellant set forth a number of concerns about his defense attorney, Raymond Buenaventura, who was purportedly using pain medications for his knee at the time.  As relevant here, appellant argued the following to support his claim that counsel was ineffective for failing to file a *Pitchess* motion:  "I explained to Mr. Buenaventura that the police officer involved in my case is the same one that I've had a prior contact with last year. This officer and his partner nearly killed me last year. Basically, I was involved with them where like it was a resisting arrest type of thing. I was punched, I was kicked, and I was choked to death by this officer. I mean, almost, you know what I mean? He sat on my head while I was in handcuffs and it was a crazy mess; you know what I mean? And I pointed out to my attorney that this guy, you know, got it out for me.  [¶] Anyway, you know, so he's made in my opinion no attempts to bring this to light to where he's investigated any part of this police brutality that I told him about; you know what I mean? There's multiple lies in this guy's police report, Officer Helu; you know what I mean? And I reported this whole incident to the FBI. I wrote these people are lying officers. They telling all kinds of lies, which is in violation of, you know, Penal Code; you're not supposed to write false police reports with knowledge and information that you know that's false; you know what I mean?  [¶] So last week, Mr. Buenaventura said that he would send [investigator] Richard Fischer over because he was showing me some things on his computer involving the 911 call and stuff like that and where the officer twisted the words of the victim; you know what I mean? And basically lied; you know what I mean? In his police report and he pointed that out to me, you know. And he said that Richard Fischer would show up and bring a copy of it so I could listen to it in detail and whatever. It never happened. He didn't show up none all last week; you know what I mean? Until today, still hasn't showed up.  [¶] . . . [¶] I can't understand why he hasn't filed no motion. You know, this officer is lying and stuff like that. Why hasn't he filed a *Pitchess* motion or done any kind of anything on my behalf? It's just not, you

7

know, I'm very unhappy. I don't want to be represented by this attorney. I feel uncomfortable with him. He's just—I would ask for a different attorney, please."

Attorney Buenaventura responded, in part: "In that discussion in the lockup section, I did share with him everything I had. I played for him the 911 call that he was referencing; I showed him the investigation reports that Mr. Fischer had. He wanted a copy of all of them then. I told him no because I was very cognizant of my duties not to disclose anything that had any address information or phone numbers so I didn't give it to him. I instructed my investigator to do that; to redact it and then give it to him. That wasn't done and it's not his fault; that falls on the defense team. [¶] . . . [¶] *The incident regarding what he's referring to about his problems with the officer in the past, he pled guilty to a resisting arrest in that case and I have the police report that reflects that.* [¶] *My strategy in this case was basically we had a cooperative victim; a victim who completely recanted at the preliminary hearing.* We had an extensive preliminary hearing where the victim was clearly trying to help Mr. Davis and explaining that she was drunk; she was agitated; she was the one who sort of got into his face and admitted to instigating this whole thing. [¶] . . . [¶] So my goal was—I think they're having problems with this case. The victim is cooperative with us and the target—*the focus on my case was going to be this victim who had recanted who had been drinking that night, who had sobered up, who now is experiencing the reality that she has to tell the truth.* So that's where I sought my investigation. [¶] I didn't get this sort of inkling from Mr. Davis at any time before today that he wasn't happy with my services. I think the thing that sort of drove this is the fact that I didn't get him his prelim transcript; that Mr. Fischer didn't get him the redacted copies, which we can take care of. [¶] . . . [¶] Now, I still believe I can represent him. . . . And I pointed out to him all the things that I had planned with respect to impeaching their witnesses against him. I did investigation on the case; I'm ready to go; but I'll defer to the Court and Mr. Davis if I'm the right attorney." (Italics added.)

The court denied appellant's *Marsden* motion, noting that many people take medication and perform very well, defense counsel was "an excellent attorney," and appellant would not be better off with a different attorney.

C. <u>No Abuse of Discretion</u>

The grounds for appellant's contention that his attorney was ineffective for failing to file a *Pitchess* motion were: (1) Officer Helu and his "partner" had "nearly killed" him previously; and (2) Officer Helu had it out for him, twisted the victim's words, and lied in his police report. The court did not abuse its discretion in concluding that counsel was not ineffective and, therefore, in denying the *Marsden* motion.

In the first place, appellant did not establish there were viable grounds for filing a *Pitchess* motion (or that it would have helped him to file one). As to the alleged prior beating by Officer Helu, appellant's attorney already had the police report of the incident and appellant had personal knowledge of what occurred. Appellant did not set forth any facts to establish a reasonable expectation that the officer's personnel file would contain something else that would aid appellant's defense in the current trial. He did not contend that the officer had engaged in brutality against others in the past, and he did not claim that the officer assaulted him in this incident. And although appellant said he had been beaten by Officer Helu and his "partner," he did not identify who that partner was. Under these circumstances, a *Pitchess* motion would have likely been denied as an unnecessary fishing expedition. (See *In re Avena* (1996) 12 Cal.4th 694, 730 [defendant, who claimed that police officer beat him during interrogation, did not demonstrate ineffectiveness of counsel for failing to make a *Pitchess* motion, where defendant did not present evidence of what counsel would have discovered or shown how it would have affected his conviction].)[5]

---

[5] Furthermore, defense counsel may have had a tactical reason for not filing the *Pitchess* motion. Counsel was aware that the prior incident with Officer Helu involved appellant *resisting arrest*; evidence that appellant had previously resisted arrest could be inconsistent with counsel's strategy to show that appellant was not the aggressor in the altercation with Bullock.

As to Officer Helu's alleged lies in his police report, appellant failed to demonstrate a plausible scenario of police misconduct: he did not present the purportedly false police report to the court; he did not identify any particular statement in the report that he claimed was a lie by Helu; and he did not set forth any evidence or offer of proof to indicate the falsity of the statements in the report. Furthermore, appellant did not demonstrate a reasonable expectation that the personnel file would contain relevant documents: he did not contend, for example, that Helu had falsified reports in the past. Moreover, appellant did not show how any false statement by Helu would have assisted his defense. To the contrary, while appellant claimed that Helu had it out for him and lied, it was Officer McMullan who would testify about Tonisha's statement and Aruwah's statement at the scene, and the statement by victim Bullock at the police station was *recorded on audiotape* for the jury to hear for itself. In short, appellant failed to demonstrate a viable *Pitchess* motion, and therefore failed to show that his attorney was ineffective for not filing one.

Appellant's reliance on *People v. Hustead* (1999) 74 Cal.App.4th 410 (*Hustead*) is unavailing. In *Hustead*, the defendant was charged with evading and resisting arrest. The defendant made a *Pitchess* motion, claiming that the arresting officer used excessive force against him and that the police report contained material misrepresentations. The prosecutor dismissed the resisting arrest charge, and the court denied the *Pitchess* motion. (*Hustead*, *supra*, 74 Cal.App.4th at pp. 412, 415-416.)

On appeal, the court concluded the *Pitchess* motion was *properly denied* to the extent it was based on the claim that the arresting officer used excessive force, because "the claim became irrelevant with the dismissal of the resisting arrest count" and the defendant failed to "demonstrate how a history of excessive force would have any bearing on the issue of evasion of arrest in a motor vehicle." (*Hustead, supra*, 74 Cal.App.4th at p. 416.) Here, like the defendant in *Hustead*, appellant was not charged with resisting arrest in this case, and appellant has failed to show how Officer Helu's alleged brutality in connection with appellant's prior resisting arrest case would have any bearing on this case, in which appellant was accused of assaulting his girlfriend.

The appellate court in *Hustead* also concluded the *Pitchess* motion should have been *granted* as to whether the officer had a history of misstating or fabricating facts in police reports, based on the defense's assertion that the police report contained material misstatements of fact. (*Hustead, supra*, 74 Cal.App.4th at p. 416.) But in doing so, the court noted the detailed nature of the showing made by the defense: "In the present case, appellant's counsel asserted in his declaration that the officer made material misstatements with respect to his observations, including fabricating appellant's alleged dangerous driving maneuvers. He also stated that appellant asserted that he did not drive in the manner described by the report and that this driving route was different from that found in the report. In addition, he claimed that a material and substantial issue in the trial would be the character, habits, customs and credibility of the officer. These allegations were sufficient to establish a plausible factual foundation for an allegation that the officer made false accusations in his report. It demonstrated that appellant's defense would be that he did not drive in the manner suggested by the police report and therefore the charges against him were not justified." (*Id*. at pp. 416-417.) It thus became relevant whether the officers had been accused of falsifying reports in the past. (*Id*. at p. 418.)

In the matter before us, by contrast, appellant did not specify what statements in the report were false, any evidence of their falsity, or how the discovery would assist his defense. Accordingly, *Hustead* does not demonstrate that the court in this case would have granted a *Pitchess* motion on the grounds appellant asserted. (*People v. Sanderson* (2010) 181 Cal.App.4th 1334, 1342 [distinguishing *Hustead* where defendant merely denied the elements of the charge against him, rather than presenting a plausible factual scenario contrary to the statements in the police report].)

Because appellant failed to show a potentially meritorious *Pitchess* motion, he failed to demonstrate that counsel was ineffective for failing to file one. Accordingly, he has not shown that the trial court abused its discretion in denying his *Marsden* motion.

III. <u>DISPOSITION</u>

The judgment is affirmed.

11

_____

NEEDHAM, J.

We concur.

_____

JONES, P.J.

_____

BRUINIERS, J.